John George BUSBY, Plaintiff,

v.

WORTHEN BANK & TRUST CO., N.A., Defendant.

No. LR–76–C–251.

United States District Court, E. D. Arkansas, W. D.

Feb. 21, 1979.

John F. Forster, Jr., North Little Rock, Ark., for plaintiff.

Robert S. Lindsey, John R. Tisdale, Little Rock, Ark., for defendant.

## OPINION

ARNOLD, District Judge.

This is a suit in equity for removal of a trustee. The case was tried to the Court on January 23 and 24, 1980. The plaintiff, John George Busby, is one of the beneficiaries of the trust. For jurisdictional purposes, he is a citizen of the Commonwealth of Virginia. The defendant, Worthen Bank & Trust Company, a national banking association, is the sole trustee at present. For jurisdictional purposes, it is a citizen of the State of Arkansas. This court therefore has jurisdiction under 28 U.S.C. § 1332(a)(1).

Anna F. Massery, the settlor, created the trust by declaration on March 16, 1962. Originally there were two trustees: Worthen and John Vincent Busby, M.D., then the son-in-law of the settlor. Paragraph 1 of the trust instrument specifies that the name of the trust is the "Thelma M. Busby Trust," Thelma M. Busby being the daughter of the settlor and the then wife of John Vincent Busby, one of the original co-trustees. Under paragraph 3, the trustees are first directed to distribute to Ida Lock $100 per month. Mrs. Lock, who has since died, was the sister of the settlor. Paragraph 3 goes on to provide as follows:

> The trustees may distribute such portion of the remaining net income or principal of the Trust to THELMA M. BUSBY and her children or to any one or more of them at such times and in such proportions as the Trustees, in their sole discretion, may determine to be needed for the care, education or welfare of such beneficiaries in accordance with their present standard of living.

Thelma M. Busby and John Vincent Busby had five children. Thus, there have been at one time or another seven beneficiaries of the trust, Mrs. Lock, Mrs. Busby, and the five Busby children. John George Busby, the plaintiff in this suit, is the oldest of these children.

On January 30, 1970, Thelma M. Busby was granted a divorce from John Vincent Busby. On February 1, 1974, after some inconclusive litigation in the Chancery

Court of Pulaski County, Arkansas, John Vincent Busby resigned as one of the co-trustees. Under paragraph 6 of the Declaration of Trust, Dr. Busby could have appointed some one to succeed him as a co-trustee. He elected not to do so. Under the same paragraph, Thelma M. Busby and Worthen could then have appointed a successor to Dr. Busby. They also elected not to do so, with the result that Worthen, ever since February 1, 1974, has been the sole trustee.

Removal of Worthen is requested on five separate grounds. Each of these grounds will be discussed in turn.

*First.* Plaintiff claims that "Worthen has exhibited favoritism towards and has been overly generous with one beneficiary," that is, his mother, Thelma Busby. Mrs. Busby has received distributions far in excess of the sums expended by the trustee for the benefit of the other beneficiaries, her five children. No purpose would be served by detailing each of these expenditures. It is sufficient to say that all of these payments were made by Worthen in good faith and for Mrs. Busby's benefit. There is no evidence that any of the payments complained of benefited the trustee itself in any way, or that any fraud was involved. Under the trust instrument, distributions of income and principal are to be made "to any one or more of" the beneficiaries "at such times and in such proportions as the trustees, in their sole discretion, may determine to be needed for the care, education or welfare of such beneficiaries in accordance with their present standard of living." It would be difficult to conceive of broader language, and the Court is not authorized to substitute its judgment for the discretionary choices made by Worthen as trustee.

No abuse of discretion has been shown. Quite the contrary. The settlor obviously intended Mrs. Busby to be the primary beneficiary. The trust was given her name. She alone of all the beneficiaries was given the power to participate in the nomination of a successor trustee. When the trust was created the settlor's oldest grandchild was nine years old. One of the beneficiaries, James Baeder Busby, had not even been born. The settlor must have had her daughter primarily in mind when the trust was created. In addition, quite apart from any intention of the settlor manifested at the time of the creation of the trust, Mrs. Busby's circumstances have naturally placed her in a position of greater need. She is not able to earn her own living, at least not sufficiently to match the standard of living she enjoyed in 1962. She was divorced from her husband in 1970 after a marriage of 19 years and is probably not equipped to compete on the job market. She has some history of emotional difficulty. In view of all these factors, the Court finds that the trustee, in making payments to Mrs. Busby substantially in excess of those made for any other beneficiary, has been faithful to the trust instrument.

*Second.* The plaintiff next claims that "Worthen . . . violated the trust and its fiduciary duty by making distributions and investments. without the approval or concurrence of the co-trustee." A number of payments made to or for the benefit of Mrs. Busby between 1969, when she and her husband were separated, and 1974, when her husband resigned as co-trustee, are complained of. There is no doubt that Worthen took several actions without the concurrence of Dr. Busby, and that in doing so it violated the terms of the trust instrument. The instrument did not give any powers to either of the co-trustees individually. All powers were granted to the co-trustees collectively. On the other hand, most of the payments questioned were later ratified by Dr. Busby. This cannot be said of a series of payments of $400 a month beginning on January 30, 1970, the date of entry of the divorce decree, and ending on August 1, 1970. These payments were not even known to Dr. Busby until May 19, 1970, and when he later protested, they were stopped. The payments were resumed, but in a reduced amount, as of September 1, 1970, the resumption having been directed by an order of the Chancery Court of Pulaski County, Arkansas. Whether the making of unauthorized pay-

ments from January through August of 1970 is sufficient to justify removal of Worthen as trustee will be discussed later in this opinion. The Court has not considered whether to surcharge Worthen for these payments. Plaintiff has expressly disclaimed any request for such relief.

*Third.* Plaintiff next asserts that "Worthen has managed the Trust assets imprudently and in breach of its fiduciary duty." This claim centers around plaintiff's theory that the return on the trust capital has been unreasonably low. A witness for the plaintiff has computed the annual yield on the trust assets for each year since 1965. Under his computations, the yield varied from 2.26% in 1973 to a high of 7.52% in 1968. In these days of inflation, the prudence of a trustee who could secure no greater return on investment might be questioned, but other evidence conclusively shows that the method of computation used by the plaintiff's expert is not reliable. The figures given are cash flow only. That is, no account is taken of the capital appreciation in value of the trust assets. When this factor is taken into account, the total rate of return over the life of the trust comes out to 7.97% after trustee's fees. For the year ending February 28, 1979, the rate of return was 16.4%.

The rate of return between 1962 and 1979 of 7.97% compares favorably with the performance of several recognized economic indices. The total rate of return for long-term government bonds over this period of time was 3.3% per year; for treasury bills, 5.1%; and for the consumer price index, surprisingly, only 4.9%. The beginning value of the trust was $199,806.89. Additional capital contributions were made in 1968 and 1969 in a total amount of $214,256.82. A total of $531,692.64 has been paid out over the years, but the market value of assets left in the trust as of February 28, 1979, was still $298,303.44. In addition, some of the assets of the trust, from time to time, have been real property occupied rent-free by beneficiaries. If those assets had been income-producing, the rate of return would have been even higher. No doubt the beneficiaries would have liked a higher yield, but based on all the evidence the Court must say that Worthen's performance was at least adequate, if not better. Some point was also made of the fact that the annual accountings have been lacking in detail and that some of the payments could have been more fully described. None of the individual beneficiaries testified that he or she had been misled, or that any information requested of the trustee had ever been denied. The evidence in support of this third allegation wholly fails to show any misconduct on the part of the trustee.

*Fourth.* Each of the grandchildren of the settlor testified that there were feelings of hostility between the beneficiaries and Worthen. Officers of the Bank, they complained, had been discourteous and insensitive. To be sure, some of the grandchildren did not get as much money from the trustee as they wanted, and sometimes the trustee probably seemed unsympathetic. Though the desires of the beneficiary are relevant, they cannot be controlling. Worthen was selected by the settlor. She had particular confidence in it. Further, not all of the beneficiaries are dissatisfied with Worthen. Mrs. Busby signed an affidavit asking that Worthen be removed, and the affidavit is in evidence, but her expression and demeanor while on the witness stand, even though for a brief time, clearly indicated that she did not want Worthen removed. The friction between Worthen and some of the beneficiaries was not so great as to interfere with the proper administration of the trust and cannot therefore be a ground for removal of the trustee. Restatement, Trusts 2d § 107(a), comment *c*, cited with approval in *Riegler v. Riegler*, 262 Ark. 70, 553 S.W.2d 37 (1977). *Accord*, Scott, Trusts § 107, at pp. 844–45 (3d ed. 1967).

*Fifth.* The most serious allegation relates to an incident of self-dealing by Worthen which involved the renegotiation in August, 1974, of a note which was at that time, and still is, an asset of the Trust.

On February 23, 1960, Dr. John V. and Thelma M. Busby executed a note for $21,-926.25 to George W. and Anna F. Massery,

the parents of Thelma M. Busby. The note was secured by a mortgage on a home which was purchased with the proceeds of the loan. Mr. Massery delivered the note to Block Realty Company for collection. He died in 1961 and left his estate to his wife, Anna. Anna died in 1963, bequeathing her estate to Worthen as trustee of the Thelma M. Busby Trust, which as noted above, had been created by declaration of trust dated March 16, 1962. The assets of the estate, which included this note, were not delivered by the executor of Anna's estate, Dr. John V. Busby, to Worthen until 1967. On July 1, 1964, before the assets of the estate were delivered to Worthen, the Busbys sold their home to John E. and Joyce D. Lock; Mr. Lock is a first cousin of Mrs. Busby and the son of Ida Lock, one of the beneficiaries of the Trust. The Locks assumed the unpaid balance of $16,442.31 on the note. The sales contract provided that the note would continue to bear interest at the rate of 3% per annum and would be payable in the amount of $66.00 monthly, plus taxes and insurance,

> . . . until <u>(maturity date) May 10, 1973 at which time the note will be renegotiated or paid in full</u>. * * *
> Should said note be negotiated, <u>by the Locks</u>, it shall bear interest at the rate of six percent (6%) per annum from the date of negotiation until paid.

The above quoted portions of the contract which are underlined were handwritten, and "JVB" was initialed beside them. Worthen had nothing to do with the negotiation of this contract.

In June, 1973, John Lock notified Worthen that the note had matured on May 10, 1973, and that he wished to renegotiate the loan. In August, 1974, the loan was renegotiated; the Locks executed a new note dated August 19, 1974, in the amount of $14,892.76, which included the principal balance of $13,513 on June 19, 1973, interest at 6% from that date until August 19, 1974,

and the real estate taxes which were then due. The new note bore interest at the rate of 6% per annum, in accordance with the terms of the original sales contract between the Busbys and the Locks. Thelma Busby, the primary beneficiary of the trust, approved the terms of the renegotiated note. In 1974 John Lock was an employee of Worthen, and had been since about 1956. He is still an employee either of Worthen or of its parent, First Arkansas Bankstock Corporation (FABCO).

The plaintiff argues that the loan to the Locks in August, 1974, was a violation of 12 U.S.C. § 92a(h), which reads:

> It shall be unlawful for any national banking association to lend any officer, director, or employee any funds held in trust under the powers conferred by this section [to act as a trustee or in other fiduciary capacity].

Worthen, on the other hand, argues that the renegotiation of the loan was perfectly legal because it was required by the terms of the July 1, 1964, sales contract between the Busbys and the Locks, which the trust had inherited. Worthen argues that as trustee, it had no choice but to abide by the terms of the contract and allow the Locks to renegotiate. The Court cannot agree. The prohibition of the statute is clear: it is unlawful for a national bank to lend an employee any funds held in trust, and that is what occurred in this case. There are mitigating factors, of course. There is no evidence that Worthen was motivated by self interest or other ulterior consideration in making the loan. Still, the loan violated the clear prohibition of the statute. Whether this is a sufficient ground for removal, when considered alongside other conduct of the trustee, will be discussed later.

Worthen relies also on 12 C.F.R. § 9.12(b) (1974) [1] which provides:

---

1. In 1962, Congress enacted Pub.L. 87–722, which transferred jurisdiction over most of the trust activities of national banks from the Board of Governors of the Federal Reserve System to the Comptroller of the Currency.

Pub.L. 87–722 is codified at 12 U.S.C. § 92a. The Comptroller then asked for suggestions for changes in regulations applicable to trust activities, and new regulations were promulgated pursuant to the authority granted the Comp-

(b) Property held by a national bank as fiduciary shall not be sold or transferred, by loan or otherwise, to the bank or its directors, officers, or employees, or to individuals with whom there exists such a connection, or organizations in which there exists such an interest, as might affect the exercise of the best judgment of the bank in selling or transferring such property, or to affiliates of the bank or their directors, officers or employees, except:

(1) Where lawfully authorized by the instrument creating the relationship or by court order or by local law; * * *

Worthen argues that the loan fell within the exception set forth above because it was "lawfully authorized by the instrument creating the relationship" and "by local law." The Court cannot agree. The instrument creating the relationship is the trust declaration, not the sales contract, as suggested by Worthen. Other portions of Part 9 of Title 12 make this clear. For example, 12 C.F.R. § 9.11 (1974) requires that funds held by a bank in a fiduciary capacity be invested in accordance with the "instrument establishing the fiduciary relationship . . .," and Part 9 when read as a whole makes clear that the "instrument" referred to in the self-dealing provisions of § 9.12(b) is the document which creates the trust relationship. The declaration of trust does not authorize loans to employees of Worthen or FABCO. Nor was the loan authorized "by local law." Worthen suggests that this term encompasses the common law of Arkansas governing contracts; since the law of Arkansas governing contract relations requires parties to abide by the terms of a contract lawfully negotiated, Worthen argues that the loan to Lock was authorized "by local law." The contention must be rejected. 12 C.F.R. § 9.1(f) (1974) defines local law as the "law of the State or other jurisdiction governing the fiduciary relationship." Worthen has cited no law of Arkansas, and the Court is aware of none,

which would allow a trustee to make a loan to its employee or the employee of its parent company. It follows that the renegotiation of the loan to the Locks in August, 1974, violated the self-dealing provisions of 12 C.F.R. § 9.12(b) (1974).

■ The arguments earnestly advanced by the Bank, that it was required by contract to renegotiate the loan to John Lock, and that the contractual provision requiring renegotiation was already in existence when the note became an asset of the Trust, are not without force. The dispositive point, in this Court's judgment, however, is that Worthen is the trustee of an express trust. As such, it is subject to what is probably the highest standard of fiduciary duty known to the law. Doubts must be resolved against the trustee, and against its employees, and in favor of the beneficiaries. See Scott, Trusts §§ 170, 170.17, 170.25 (3d ed. 1967). The famous passage by Chief Judge (later Mr. Justice) Cardozo, speaking for the New York Court of Appeals, has lost none of its force:

Many forms of conduct permissible in a work-a-day world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the "disintegrating erosion" of particular exceptions. Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court.

*Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928). The same standard has been consistently applied by the Su-

troller by 12 U.S.C. § 92a(j). They appear at Part 9 of Title 12 of the Code of Federal Regulations. See *Investment Co. Institute v. Camp*, 401 U.S. 617, 621–22, 91 S.Ct. 1091, 1094, 28

L.Ed.2d 367 (1971). References in this opinion are to C.F.R. provisions in effect when the loan was made in August, 1974. The cited provisions are also currently in effect.

preme Court of Arkansas. See, e. g., *Hardy v. Hardy*, 222 Ark. 932, 940, 263 S.W.2d 690, 694 (1954). The trustee has a duty to avoid even the appearance of impropriety, and the making of a loan to an employee is inconsistent, both in appearance and in fact, with the loyalty it owes to the Trust and the beneficiaries.

Worthen could have avoided the problem in at least two ways. It could have refused to honor the Locks' contractual right of renegotiation, basing its refusal on 12 U.S.C. § 92a(h) and 12 C.F.R. § 9.12(b), which under the Supremacy Clause override the state law of contracts. Or it could simply have renegotiated the note and bought it from the Trust, thus eliminating any question of the propriety of lending trust funds to an employee, and preventing the Trust from losing interest income through retention of a six per cent note at a time when the market interest rate was about 8½ per cent.

### Relief

■ The question of relief remains. Though the Court has found that Worthen's conduct fell short in two respects—the making of certain payments in 1970 without the permission of the co-trustee, and the holding of the Lock note—it does not follow that it must be removed as trustee. See *Riegler v. Riegler*, 262 Ark. 70, 553 S.W.2d 37 (1977), in which the Supreme Court of Arkansas adopted the standards of Section 107 of the Second Restatement of Trusts. The Restatement, among other things, says that "[a] court may remove a trustee if his continuing to act as trustee would be detrimental to the interests of the beneficiary. The matter is one for the exercise of reasonable discretion by the court." Comment *a* on § 107(a). In addition, according to Comment *f*, "[t]he court will less readily remove a trustee named by the settlor than a trustee appointed by the court or by a third person who is by the terms of the trust authorized to appoint a trustee." The reason is obvious. A trust is an expression of the property rights of the settlor, and her wishes as set forth in the declaration should be respected, unless the trustee has

been guilty of such persistent and damaging misconduct that, on the whole, it would be in the best interest of the beneficiaries for it to be removed. It is not every mistake or neglect of duty, in short, that requires or justifies removal. See, e. g., *Blumenstiel v. Morris*, 207 Ark. 244, 180 S.W.2d 107 (1944); *Harr v. Fordyce*, 88 Ark. 192, 113 S.W. 1033 (1908); *Williams v. Nichol*, 47 Ark. 254, 1 S.W. 243 (1886).

The Court of Appeals for this Circuit has stated the general rule as follows:

A trustee appointed by will or deed may not be removed by the courts unless there appears a clear necessity for the removal to save the trust property. In the absence of such a showing the trustee appointed by the settlor cannot be removed because of a mistake of judgment nor always for a breach of the trust. Mere hostility between the trustee and the beneficiaries of the trust is alone insufficient in law to require the removal of the trustee.

*Sternberg v. St. Louis Union Trust Co.*, 163 F.2d 714, 719 (8th Cir. 1947). This passage, though it does not come from an Arkansas case, is an apt summary of the principles of law that may be distilled from the several opinions of the Supreme Court of Arkansas on this subject. See also Scott, Trusts § 107.1 (3d ed. 1967).

■ The issue comes down to one of equitable discretion. Worthen's conduct as trustee, although not perfect, has been, when considered in the context of the full 17 years of the existence of the Trust, competent and in the best interests of the beneficiaries, viewing those interests in the light of trust instrument. Removal of Worthen would necessitate the Court's appointing a new trustee, and none has been suggested. As far as the unauthorized payments made in 1970 are concerned, they were unquestionably for the benefit of the primary beneficiary of the Trust, and Worthen may well have believed that the co-trustee, being recently divorced from her, would have a conflict of interest, in fact if not in law. Worthen should have applied to a court for

instructions, but if it had done so, the payments would almost certainly have been approved. As for the incident of the Lock note, though the Court is troubled by it in principle, the amount of actual loss to the Trust is not great when considered against the background of Worthen's overall performance as steward of the trust assets. The Court therefore finds that it would not be in the best interests of the beneficiaries for Worthen to be removed as trustee, and the request for removal will be denied.

Removal of the trustee is the only relief that has thus far been requested by the plaintiff, and ordinarily disposition of this request would conclude the case. Plaintiff has not asked that the trustee be directed to divest itself of the Lock note. Although a court of equity would have power to do so, the Court is not disposed to issue such a mandatory injunction sua sponte. On the other hand, simple dismissal of the complaint would leave the trustee in what the Court has held to be an unlawful position. The plaintiff, now that he knows that Worthen is not going to be removed, may wish to seek other, and lesser, relief. It would be inequitable to foreclose an opportunity to consider such relief without obtaining the views of the parties. Counsel for plaintiff is given until March 3, 1980, to file a motion for injunctive or other relief with regard to the Lock note. If such a motion is not filed, judgment will be entered dismissing the complaint with prejudice. If such a motion is filed, defendant will be given until March 13, 1980, to respond to it. If defendant believes that it would be unfair to decide the question without further proof, it should set out in its response what additional proof it would seek to offer. When these submissions have been received and considered, the Court will prepare a further opinion and enter final judgment. The question of attorney's fees will also be addressed at that time.

IT IS SO ORDERED this 20th day of February 1980.